UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT and RHONDA SOUSLEY,
and INNOVATIVE MEDICINE, P.C.,

                 Plaintiffs,                    No. 13-13950

vs.                                               Hon. Gerald E. Rosen

AMBER WILLIAMS, et al.,

                 Defendants.
_____/

OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION, GRANTING DEFENDANTS' MOTION
FOR JUDGMENT ON THE PLEADINGS, IN PART, AND DISMISSING
PLAINTIFFS' REMAINING CLAIMS PURSUANT TO 28 U.S.C. § 1367(c)

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on August 15, 2014.

PRESENT:   Honorable Gerald E. Rosen
                    United States District Chief Judge

## I. INTRODUCTION

Plaintiffs Rhonda Sousley and her husband, Scott Sousley, are acupuncturists who

own their own business, Innovative Medicine, P.C.  On September 16, 2013, they filed a

Complaint against the State of Michigan; Amber Williams and Mary Hess, two

employees of Michigan's Department of Licensing and Regulatory Affairs ("LARA");

Deborah Lincoln, chairperson of the Michigan Board of Acupuncture; the National

1

Certification Commission for Acupuncture and Oriental Medicine, Inc. ("NCCAOM");
Stephanie Mills, an employee of NCCAOM; and Dr. Jennifer Hirsch, M.D. (now "Dr.
Jennifer Romano, M.D."), a former patient of the Sousleys.  This action arises out
NCCAOM's and LARA's investigation into a complaint lodged by Dr. Romano alleging
that the Sousleys were practicing acupuncture without medical supervision, as required
under Michigan law, and that Rhonda Sousley allowed her husband, Scott Sousley, to
practice acupuncture outside of the scope of his certification.

 In their original18-count Complaint, the Sousleys alleged claims against the
various defendants sounding in defamation, tortious interference with business
relationship and expectance, intentional infliction of emotional distress, gross negligence,
fraudulent misrepresentation, civil conspiracy, and violation of 42 U.S.C. § 1983.  Along
with their Complaint, Plaintiff Rhonda Sousley filed a Motion for Preliminary Injunction
seeking an injunctive order directed at NCCAOM commanding it to renew her
certification.

 The Court conducted a hearing on the Motion for Preliminary Injunction on
October 31, 2013.  After hearing the arguments of counsel, the Court concluded that
Plaintiff's motion was premature but issued no affirmative ruling, indicating its intent to
await further factual development, and, in particular, additional information concerning
the State's investigation.

 Counsel for the State Defendants thereafter supplemented the record with the

status update on the State investigation, as requested by the Court. Meanwhile, Plaintiffs filed an Amended Complaint in which they eliminated the claims against NCCAOM and Stephanie Mills upon which their Motion for Preliminary Injunction had been predicated.

In this First Amended Complaint, Plaintiffs allege claims of Gross Negligence against individual State Defendants Lincoln, Williams, Hess and unidentified John Doe State employees (Counts I, VI, VII, and VIII); claims of Fraudulent Misrepresentation, Intentional Infliction of Emotional Distress, and Tortious Interference with Business Relationship and Expectancy against Defendant Lincoln (Counts II, III, IV), Negligent Misrepresentation against Defendant NCCAOM (Count V), and a Section 1983 Claim of "Unlawful Seizure" against Defendants Lincoln and Williams (Count IX).[1] The State Defendants have moved for entry of Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) for failure to state a claim upon which relief can be granted, and seek dismissal of Plaintiffs' Amended Complaint, in its entirety.

## II.  FACTUAL BACKGROUND

The National Certification Commission for Acupuncture and Oriental Medicine ("NCCAOM") is an organization, that, through testing and education, validates competence in the practice of acupuncture and oriental medicine. To legally practice acupuncture in the State of Michigan, a practitioner must be registered with the State and

---

[1] This Section 1983 "unlawful seizure" claim against Defendants Lincoln and Williams is the only claim over which this Court has original jurisdiction.

3

certified by NCCAOM or by another organization with equivalent certification standards as determined by the State Board of Acupuncture. *See* Mich. Admin. Code R. 338.13003. At the time of the events complained of in this action, Rhonda Sousley was registered as a certified acupuncturist with the Michigan Department of Licensing and Regulatory Affairs ("LARA") and had a valid NCCAOM certification[2]. Scott Sousley was certified by the National Acupuncture Detoxification Association ("NADA").[3] However, all acupuncturists, whether certified by NCCAOM, NADA or another organization, may only practice acupuncture in Michigan under the delegation of an allopathic or osteopathic physician. *See* Mich. Admin. Code R. 338.13035; M.C.L. §§

---

[2] As a condition of her NCCAOM certification, Ms. Sousley signed and agreed to be bound by the NCCAOM's Code of Ethics and the NCCAOM Grounds for Professional Discipline, the latter of which include "misrepresenting professional credentials" and "exceeding the scope of practice as defined by law or certification." *See* Defendants' Response to Motion for Prelim. Inj., Exhibits A-C.

[3] A person certified by NADA is not subject to Michigan's registration requirements. *See* M.C.L. § 333.16511(2)(b). Unlike traditional acupuncture, the scope of treatment engaged in by NADA acupuncturists is very limited: NADA acupuncturists use a standardized auricular (i.e., ear) acupuncture protocol for behavioral health, including addictions, mental health, and disaster and emotional trauma. *See* the NADA website, http://www.acudetox.com. NADA acupuncturists treat their clients by applying fine gauge, sterilized, one-time use stainless steel needles just under the skin at five designated ear points in each auricle (outer ear), where they remain for up to an hour while the client (in most circumstances) relaxes quietly in a comfortable chair. *Id.* Ordinarily, groups of auricular acupuncture clients sit together while undergoing the treatment. *Id.* The procedure functions as an adjunct to a comprehensive treatment program offering the basic therapeutic elements of counseling, education, family involvement, mutual support group involvement, supportive health care of general nature in all types of treatment settings including inpatient, outpatient, incarcerated, shelters, harm reduction and street outreach can utilize this treatment. *Id.*

4

333.16109(2); 333.16215.

The dispute in this action arises out of the Sousleys' treatment of one client, Dr. Jennifer Romano. Dr. Romano[4] was an *in vitro* fertilization patient at Reproductive Medicine Associates of Michigan ("RMA") in Troy, Michigan.

According to Dr. Bradley Miller, the Managing Partner of RMA, acupuncturists have serviced RMA patients to optimize fertilization treatment outcomes over the past six or seven years. [*See* 5/23/12 Letter to NCCAOM from Brad Miller, M.D., NCCAOM Response to Motion for Prelim. Inj., Ex. H.] As a courtesy to its patients, RMA allows acupuncturists to use its facility prior to and following embryo transfer. *Id.* RMA views these acupuncture providers as "independent contractors." [*See* NCCAOM Response Ex. I.] Although RMA will provide patients a list of several different acupuncture providers, RMA patients choose to undergo acupuncture on their own, and they make their own arrangements to receive acupuncture prior to and following embryo transfer. [*See* NCCAOM Response Ex. H.]

Jennifer Romano was scheduled for an embryo transfer on January 23, 2012. Therefore, she made an appointment for a pre-*in vitro* fertilization acupuncture treatment with, and received treatment from, Plaintiff Rhonda Sousley that same day. Dr. Romano's embryo transfer, however, ended up not being done as scheduled on January

---

[4] According to the evidence of record, Dr. Romano is a physician at the University of Michigan.

23, 2012.  When the procedure was subsequently rescheduled for the next day, Dr.

Romano called Innovative Medicine to make another appointment with Rhonda Sousley.

Scott Sousley answered the call and told Dr. Romano that either he or his wife could

provide the treatment as one of them would be available on the scheduled day.

Scott Sousley provided Dr. Romano with pre-*in vitro* acupuncture treatment on

January 24, 2012.  She thereafter underwent an *in vitro* embryo transfer.  The embryo

transfer was successful but Dr. Romano subsequently miscarried.

Thereafter, Dr. Romano investigated Scott Sousley's credentials and found that he

was not registered as a acupuncturist in Michigan.  She reported this to NCCAOM and

filed a complaint with the Michigan Department of Licensing and Regulatory Affairs.

According to Plaintiffs, they first became aware that they were being investigated

regarding their treatment of Dr. Romano on March 28, 2012.  They allege that on that

date, they  were contacted by Defendant Deborah Lincoln, the Chairperson of the

Michigan Board of Acupuncture regarding Dr. Romano's allegations.  [Amend. Compl.,

¶ 21.]  According to Plaintiffs, Scott Sousley received a call from Defendant Lincoln on

that date, and that Lincoln informed Scott that a patient had complained that he was not

qualified to perform acupuncture at RMA, and allegedly told him that he could be put in

jail for practicing acupuncture (presumably without proper licensing or registration). [*Id*.

at ¶ 22.]

Believing that Lincoln did not understand the requirements for certification and

State registration, Rhonda Soulsey contacted Lincoln to clarify the matter and explain the situation. *Id.* at ¶ 23. However, according to Plaintiffs, Lincoln maintained her position and informed Ms. Sousley that she should be removed from the Board of Acupuncture. *Id*. at ¶ 24.[5] Plaintiffs further allege that Lincoln contacted Reproductive Medicine Associates (where Scott Sousley had performed the complained-of procedure), and informed RMA that Scott was performing acupuncture illegally. *Id.* at ¶ 25.

On April 17, 2012, Stephanie Mills, a Regulatory Affairs and Research Specialist with NCCAOM wrote to Rhonda Sousley regarding the complaint. [*See* Response Ex. C.] Sousley responded on April 19th and indicated in her response that Scott Sousley was certified in acupuncture by NADA and was practicing "under the direct supervision of a physician." [*See* Response Ex. D.][6] However, she provided no information as to the identity of the supervising physician. Therefore, on April 20th, Ms. Mills again wrote to Sousley and asked for this missing information. [*See* Response Ex. E.]

Sousley wrote back to Mills on May 1, 2012 and stated that the complainant "was

---

[5] Rhonda Sousley was a member of the Michigan Board of Acupuncture from 2008 through 2012 and Vice President of the Board since 2011.

[6] As the treatment Scott Sousley provided Dr. Romano was beyond the scope of his NADA certification, he could only perform the treatment under the supervision of a licensed physician. *See* M.C.L. § 333.16215(1). "Supervision" is defined as "the overseeing of or participation in the work" of the unlicensed individual and requires availability of direct communication with the licensed supervisor and the supervised individual, the licensee's availability for regular review of the practice of the supervised individual, and the provision by the licensed supervising professional of predetermined procedures. M.C.L. § 333.16109.

treated in a medical facility -- Reproductive Medical Associates of Michigan, under the direct supervision of Dr. Bradley Miller, M.D., a licensed physician in the State of Michigan."  [*See* Response Ex. F.]

Accordingly, Ms. Mills thereafter wrote to Dr. Miller on May 8, 2012 asking for verification of his supervision of both of the Sousleys.  [*See* Response Ex. G.]  Dr. Miller responded to Ms. Mills's inquiry on May 23, 2012 and stated that, although acupuncturists had been allowed to use RMA's facilities to provide treatment to RMA fertility patients for the previous six years, he provided no oversight or supervision of the treatment provided by either of the Sousleys.  [*See* Response Ex. H.]  He further stated that RMA had conducted its own investigation into Romano's complaint and the State of Michigan's acupuncturist licensing requirements and added that RMA had recently implemented a "Delegation of Services Agreement" procedure.  *Id.*

On June 20, 2012, Dr. Romano's complaint was submitted to the NCCAOM Discipline Committee along with the findings of Mills's investigation.  The Committee asked Ms. Mills to write the Michigan Attorney General for an opinion as to whether or not Sousley was acting in accordance with Michigan law.  Mills did so on June 27, 2012, and when no response was forthcoming, she wrote again on December 5, 2012.  [*See* Response Ex. I.]  On January 15, 2013, the Michigan Department of Licensing and Regulatory Affairs sent Mills a letter in response to her letters to the Attorney General and indicated that LARA was launching an investigation to determine whether a formal

complaint against Rhonda Sousley was warranted.  [*See* Ex. J.].

Meanwhile, on August 14, 2012, Scott Sousley received a notice from Amber Williams, an investigator for LARA, notifying him that LARA was investigating his treatment of Dr. Romano.  [Amend. Compl., ¶ 36.] The Sousleys allege that they were never informed of the status or outcome of that investigation until after Scott Sousley submitted a FOIA request to LARA on March 13, 2013 seeking information regarding the LARA investigation.  *Id.* at ¶ 43. Shortly thereafter, Defendant Mary Hess, a support person in LARA's FOIA Unit, responded to the request and notified Scott that the investigation of his unregistered practice of acupuncture was closed by LARA on October 16, 2012.  *Id.* The investigation into the activities of Rhonda Sousley, however, continued.

In late April 2013, Rhonda Sousley applied to NCCAOM for recertification. (Her NCCAOM certification was due to expire at the end of September 2013).  Although NCCAOM accepted her application for recertification and her application fee, because of the pendency of the LARA investigation, a decision was made to place Sousley's recertification on hold pending the outcome of the State's review.  [*See* Response Ex. K.] When Ms. Sousley had not heard anything more regarding her certification by September 15, 2013, the Sousleys instituted this action in this Court.  Along with their Complaint, Rhonda Sousley filed a Motion for Preliminary Injunction against NCCAOM seeking an order commanding that NCCAOM grant her application for recertification.

As indicated above, the Court heard oral argument on Ms. Sousley's motion for injunctive relief on October 31, 2013, but made no immediate affirmative ruling on the motion at that time, and took the matter under advisement. Heeding the suggestion of the Court, Plaintiffs thereafter filed an Amended Complaint, but they did not amend or withdraw the Motion for Preliminary Injunction.

On April 24, 2014, the State Defendants -- Deborah Lincoln, Mary Hess and Amber Williams -- moved for Judgment on the Pleadings on Plaintiffs' First Amended Complaint. On or about that same date, the Michigan Attorney General, acting on behalf of the Michigan Department of Licensing and Regulatory Affairs, lodged a formal Administrative Complaint against Rhonda Sousley charging her with negligent delegation of a procedure, performance of acupuncture without proper supervision, and aiding and abetting, in violation of Sections 16215, 16221(a), and 16221(h) of the Public Health Code, M.C.L. §§ 333.16215 and 333.16221(a), (h), and 2011 AACS, R. 338.13035. The administrative proceedings remain pending as of this date.

## III.  DISCUSSION

A.    RHONDA SOUSLEY HAS FAILED TO DEMONSTRATE ENTITLEMENT
       TO PRELIMINARY INJUNCTIVE RELIEF

1.    APPLICABLE STANDARDS

In deciding whether a plaintiff is entitled to a temporary restraining order or preliminary injunction, the court is to consider four factors:

(1)  whether the plaintiff has a strong likelihood of success on the merits;

10

(2)  whether it would suffer irreparable harm if preliminary relief is not issued;

(3)  whether the issuance of a preliminary injunction will not cause substantial

harm  to third parties; and

(4) whether the public interest would be served by the issuance of a preliminary

injunctive order.

*Sandison v. Michigan High School Athletic Association, Inc*., 64 F.3d 1026, 1030 (6th

Cir. 1995); *UASCO Coal Co. v. Carbomin Energy, Inc*., 689 F.2d 94, 98 (6th Cir. 1982).

The four considerations applicable to preliminary injunctions are factors to be balanced

and are not prerequisites that must be satisfied.   *In re Eagle-Picher Indus., Inc*., 963 F.2d

855, 859 (6th Cir. 1992).  "These factors simply guide the discretion of the court; they are

not meant to be rigid and unbending requirements." *Id*.  The burden is on the party

seeking injunctive relief to establish the basis for the relief.  *Merrill, Lynch, Pierce,

Fenner & Smith, Inc. v. E.F. Hutton & Co., Inc.*, 403 F. Supp. 336, 339 (E.D. Mich.

1975).

(a)    PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE
       MERITS

Plaintiff Rhonda Sousley's request for injunctive relief in the form of an order

commanding NCCAOM to grant her application for recertification is predicated upon

claims she alleged in her original Complaint.  Plaintiff's original theory was that

NCCAOM was liable under a theory of *respondeat superior* liability for the allegedly

defamatory and negligent actions of its Regulatory Affairs and Research Specialist

11

2:13-cv-13950-GER-LJM   Doc # 60   Filed 08/15/14   Pg 12 of 27   Pg ID 736

Stephanie Mills.   However, following the hearing on Plaintiff's motion, Plaintiff filed an

Amended Complaint which no longer names Stephanie Mills as a defendant and alleges

no claims of defamation, no claims of negligence, or respondeat superior liability against

Defendant NCCAOM, and no claim for injunctive relief.  The Amended Complaint

supersedes and supplants Plaintiffs' original Complaint.  *Parks v. Federal Express Corp.*,

1 F. App'x. 273, 277 (6th Cir.2001) ("[A]n amended complaint supplants the original

complaint and becomes the only live complaint in a civil case"); *see also  Fritz v.

Standard Sec. Life Ins. Co.*, 676 F.2d 1356, 1358 (11th Cir.1982) ("Under the Federal

Rules, an amended complaint supersedes the original complaint." *Id.*) (citations omitted).

Since Plaintiff no longer has any live claims of defamation or negligence against

Defendant Mills, and no longer has any live claim of *respondeat superior* liability against

NCCAOM, she cannot demonstrate a likelihood of success on the merits on the claims

upon which she had predicated her request for injunctive relief.  However, even if the

Court were to treat Plaintiffs' original Complaint claims as "live" claims for purposes of

Plaintiff's motion, there is no likelihood of success on the merits of those claims.

     i.  Defamation

       To make out a claim of defamation the plaintiff must establish that a false and

defamatory statement was made concerning her, that an unprivileged communication of

the statement was made to a third party, that the publisher was at least negligent, and

either "defamation *per se*" is demonstrated, or it is shown that the plaintiff suffered harm

as a result. *Mitan v. Campbell*, 474 Mich. 21, 24; 706 N.W.2d 420 (2005). Ms. Sousley has not demonstrated that she can satisfy even the first of these elements.

Plaintiffs' defamation claim is predicated upon their allegation that Mills "made false and defamatory statements concerning the Sousleys to RMA." [Compl. ¶ 141.][7] Yet she concedes that she has no evidence that Mills made any false and defamatory statement about her: "The specific statements made to RMA are unknown." *Id.* ¶ 142. Even in her Brief in Support of the instant Motion, Rhonda Sousley admits that she "has a limited knowledge of the nature of the conversation between Mills and individuals at RMA" but believes that she "will obtain a clearer picture of the strength or weaknesses of [her] defamation claim against Mills through the course of discovery." [Plaintiff's Brief in Support of Motion for Preliminary Injunction, p. 2.] Being "hopeful to obtain a clearer picture of the strength or weaknesses" of her claim however, is a far cry from establishing a "likelihood of success on the merits" of the claim, and clearly not enough upon which an injunctive order may be based.

---

[7] Plaintiff wisely does not purport to base her defamation claim on any of Mills's communications with the State of Michigan or her superiors at NCCAOM as such communications plainly would be subject to the "shared interest" qualified privilege which "extends to all bona fide communications concerning any subject matter in which a party has an interest or a duty owed to a person sharing a corresponding interest or duty." *Rosenbloom v. Vanek*, 182 Mich. App. 113, 117 (1989); *see also Nuyen v. Slater*, 372 Mich. 654, 655 (1964) (private citizen's letter to State Health Department complaining about a nurse held protected by the "shared interest" privilege).

13

ii. <u>Negligence</u>

Nor has Plaintiff shown a likelihood of success on the merits of her negligence claim against Stephanie Mills.

A *prima facie* case of negligence is established by proof of four elements: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty; (3) causation; and (4) damages. *Case v. Consumers Power Co.*, 464 Mich. 1, 6 (2000). Plaintiff's Complaint is devoid of what, if any, duty was owed to her by Mills and/or NCCAOM.

The sum and substance of this claim is Plaintiffs' allegation that Mills acknowledged in her April 20, 2012 letter that Ms. Sousley had correctly interpreted Michigan law as permitting an acupuncturist to practice under the supervision of a licensed physician but despite this acknowledgment, Mills continued her investigation by contacting RMA "despite there being no evidence [of] any wrongdoing on the part of the Sousleys." [*See* Compl. ¶¶ 150-153.] However, Ms. Sousley's subjective belief that she had done nothing wrong is belied by Dr. Miller's letter informing NCCAOM that he had not been supervising either of the Plaintiffs' administration of acupuncture at RMA, which, as Ms. Sousley acknowledges, would be a violation of the law.

Section 16215 of the Public Health Code provides, in relevant part:

(1)     Subject to subsections (2) to (6), a licensee who holds a license other than a health profession subfield license may delegate to a licensed or unlicensed individual who is otherwise qualified by education, training, or experience the performance of selected acts, tasks, or functions where the acts, tasks, or functions fall within the scope of practice of the licensee's profession and will be performed

14

under the licensee's supervision. A licensee shall not delegate an act, task, or function under this section if the act, task, or function, under standards of acceptable and prevailing practice, requires the level of education, skill, and judgment required of the licensee under this article.

(2)     Subject to subsection (1) and except as otherwise provided in this subsection and subsections (3) and (4), a licensee who is an allopathic physician or osteopathic physician and surgeon shall delegate an act, task, or function that involves the performance of a procedure that requires the use of surgical instrumentation only to an individual who is licensed under this article. **A licensee who is an allopathic physician or osteopathic physician and surgeon may delegate an act, task or function described in this section to an individual who is not licensed under this article if the unlicensed individual is 1 or more of the following and is directly supervised by a licensed allopathic physician or osteopathic physician and surgeon who is physically present during the procedure**:

* * *

(3)     **Subject to subsection (1), a licensee who is an allopathic physician or osteopathic physician and surgeon may delegate an act, task, or function as described in subsection (2) to an individual who is not licensed under this article and who is 1 of the following:**

**(a) Performing acupuncture. . . .**

M.C.L. § 333.16215(1)-(3).

Thus, under the law, Mills had a reasonable basis for continuing the investigation despite Ms. Sousley's proclaimed innocence of wrongdoing.  Therefore, Mills acted in accordance with the duty owed by a reasonably prudent person in her position.

In sum, Plaintiff has failed to demonstrate a likelihood of success on the merits on

either of her claims against Mills and NCCAOM.

(b)     PLAINTIFF HAS NOT DEMONSTRATED SATISFACTION OF ANY OF
        THE OTHER PRELIMINARY INJUNCTION FACTORS

The other factors that the Court is to consider and weigh in deciding whether to

grant preliminary injunctive relief are irreparable harm, harm to others, and the public

interest.

Plaintiff has not demonstrated irreparable harm. An irreparable injury is an injury

that "cannot be undone through monetary remedies," and, as a general rule, "a

preliminary injunction is an inappropriate remedy where the potential harm to the movant

is strictly financial." *Performance Unlimited, Inc. v. Questar Publishing, Inc.*, 52 F. 3d

1373, 1382 (6th Cir. 1995); *see also Taubman v. Webfeats*, 319 F.3d 770, 778 (6th Cir.

2003). Plaintiff has made no showing that monetary relief would be an insufficient

remedy for any losses she claims as the result of Mills's actions. Indeed, Plaintiff

concedes that her losses are financial ("[Mills's] pursuit of this investigation resulted in

significant damage to Dr. Sousley and cost her considerable sums in lost business and

revenue." Plaintiff's Brief, p. 3.] Though, the amount of losses might be difficult to

compute, it is not impossible to quantify her losses, particularly where, as here, there has

yet been any determination made that she will not be granted recertification by

NCCAOM once the LARA administrative proceedings are concluded.

Moreover, to recertify Plaintiff before the State administrative proceedings are

completed would potentially cause harm to other prospective patients who obviously

16

have a right to treatment performed on them in compliance with the law.  It certainly

would not be in the public interest to recertify Plaintiff until after the State's

administrative proceedings are completed.

For all of the foregoing reasons, the Court concludes that Rhonda Sousley's

request for a Preliminary Injunction should be DENIED.

B.    THE STATE DEFENDANTS ARE ENTITLED TO ENTRY OF JUDGMENT
       ON THE PLEADINGS ON PLAINTIFFS' FEDERAL CLAIM

1.    APPLICABLE STANDARDS

Motions for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) are

analyzed under the standards which govern Rule 12(b)(6) motions to dismiss for failure

to state a claim.  *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 295 (6th

Cir.2008).  The only difference is that, on a motion for judgment on the pleadings, the

Court reviews not only the complaint, but also the answer and any written instruments

attached thereto.  *Edwards v. Calpin* 2011 WL 1321400, *2 (M.D. Pa. 2011); *see also

Housing Auth. Risk Retention Group, Inc. v Chicago Housing Auth.*, 378 F.3d 596, 600

(7th Cir. 2004) ("In a motion for judgment on the pleadings, the court considers the

pleadings alone, which consist of the complaint, the answer, and any written instruments

attached as exhibits.")  In so doing, the Court accepts the complaint's allegations as true,

and construes those allegations in the plaintiff's favor.  However, the Court need not

accept as true legal conclusions or unwarranted factual inferences.  *Id.*  Further, as with

12(b)(6) motions to dismiss, to survive a motion for judgment on the pleadings, the

17

plaintiffs' complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but has not 'show[n]' -- that the pleader is entitled to relief.'"  *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).  If the plaintiffs do "not nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed."  *Twombly*, 550 U.S. at 570.

2.   THE STATE DEFENDANTS ARE SHIELDED BY QUALIFIED IMMUNITY FROM LIABILITY ON PLAINTIFFS' FEDERAL CLAIM UNDER 42 U.S.C. § 1983

Plaintiffs assert only one federal claim in their First Amended Complaint -- a Section 1983 claim against individual State Defendants Amber Williams and Deborah Lincoln in Count IX alleging "unlawful seizure" of their property in violation of the Fourth Amendment.  This claim is predicated upon the purported decrease in the value of Plaintiffs' business, allegedly as a result of Williams' and Lincoln's pursuit and conduct of the State investigation of the Sousleys acupuncture practice and "other acts" of these Defendants, which Plaintiffs fail to specify.  *See* Amended Compl., ¶¶ 125-127.  It is

Plaintiffs' theory that as a result of the State investigation, they lost business and revenue which led to their eventual closure of Innovative Medicine. They contend that this alleged loss of the value of their business is sufficient to demonstrate that Williams and Lincoln effectuated a "seizure" under the Fourth Amendment.

However, Plaintiffs do not identify any decision from any court that supports their framing of lost business revenue as a Fourth Amendment seizure.

"The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." *Florida v. Jardines*, ___ U.S. ___, 133 S.Ct. 1409, 1414 (2013) (quoting *Oliver v. United States*, 466 U.S. 170, 176, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984)). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property. " *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656 (1984). As the Supreme Court explained in *Jacobsen,* "[w]hile the concept of a 'seizure' of property is not much discussed in our cases, this definition follows from our oft-repeated definition of the "seizure" of a person within the meaning of the Fourth Amendment -- meaningful interference, however brief, with an individual's freedom of movement." *Id.* at 113 n. 5, 104 S.Ct. at 1656 n. 5. "[A] seizure threatens an individual's distinct interest in retaining possession of his or her property." *Thomas v. Cohen* 304 F.3d 563, 569-70 (6th Cir. 2002) (quoting *Jacobsen*, 466 U.S. at 113).

However, "the Supreme Court has only applied the 'meaningful interference with

possessory interests' definition of seizure in cases where there is no debate that the challenged act is one of *taking property **away** from an individual* and the [only] issue is whether that act of taking property away constitutes a meaningful interference with possessory interests." *Fox v. Van Oosterum*, 176 F.3d 342, 351 (6th Cir. 1999) (emphasis added). Thus, Plaintiffs' reliance on the one-sentence "meaningful interference with possessory interests" excerpt from *Jacobsen* as restated in *Soldal v. Cook County, Ill.,* 506 U.S. 56 (1992) and quoted in *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002), as the basis of their theory that the disruption of their business caused by Defendants' investigation constituted a Fourth Amendment seizure, is misplaced. There was no "taking away" of Plaintiffs' property by Defendants Williams or Lincoln; they were not separated from their property nor were they in any way restrained or detained during the investigation. Simply stated, there was no interference with their "possessory interests" in the constitutional sense.

Plaintiffs appear to conflate the concepts of "possessory" and "ownership" interests. Plaintiffs may *own* Innovative Medicine, but their *possessory* interests in the company or its property were not infringed upon by the LARA investigators. Plaintiffs cite *Farm Labor,* and *Soldal* and *Jacobsen* -- the cases upon which the *Farm Labor* court relied -- as support for their claim. However, unlike the aggrieved parties in *Farm Labor, Soldal* and *Jacobsen*, Plaintiffs here were not separated from any tangible property -- no property, records or funds were seized or "taken away" by Defendants;

20

thus, there was no interference with Plaintiffs' possessory interests in real or personal property.  The inapplicability of these cases is obvious when the facts of those cases are compared to the facts in this case.

In *Farm Labor,* it was a state trooper's four-day detention of immigrant motorists' green cards on less than probable cause that constituted a seizure that violated the Fourth Amendment. In *Soldal*, it was the defendants' attachment of a tow truck to the plaintiffs' mobile home, and then tearing the home from its foundation and towing it to another lot that constituted a "seizure" within meaning of Fourth Amendment.  In *Jacobsen,* the Court determined that a wrapped parcel which had been delivered to a private freight carrier for shipment to defendants was an "effect" within the meaning of the Fourth Amendment such that federal agent's opening of the package and removal of a trace of powder contained therein without having obtained a warrant constituted an unconstitutional seizure of the package and its contents.  These cases make clear that, under the facts of this case, the rights Plaintiff allege to have been violated in Count IX of their Amended Complaint are not cognizable under the Fourth Amendment.[8]

However, even if the Court were persuaded that Plaintiffs' had sufficiently alleged

---

[8] Nor are they cognizable under any other constitutional provision.  *See Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 672 (1999) (the activity of making a profit is not property in the ordinary sense of a right protected by the Due Process Clause); *Dean v. McWherter,* 70 F.3d 43, 45 (6th Cir. 1995) (injury to reputation does not violate a protected liberty interest); *VanderZee v. Reno*, 73 F.3d 1365, 1369-70 (5th Cir. 1996) (an allegation of diminished employment opportunities resulting from harm to reputation is insufficient to state a constitutional violation).

a Fourth Amendment violation, Defendants have asserted the defense of qualified
immunity.

Qualified immunity shields public officials who perform discretionary functions
from the necessity of defending against tort liability so long as their conduct does not
violate clearly established rights of which a reasonable official would have known.  *See
Fisher v. Harden*, 398 F.3d 837, 842 (6th Cir. 2005).  The qualified immunity doctrine is
designed to "avoid excessive disruption of government and permit the resolution of many
insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 452 U.S. 800, 818
(1982).  It protects "all but the plainly incompetent or those who knowingly violate the
law." *Malley v. Briggs*, 475 U.S. 353, 341 (1986).  Qualified immunity is an affirmative
defense; once asserted, the "burden of proof is on the plaintiff to show that the
defendant[s] [are] not entitled to qualified immunity." *Armstrong v. City of Melvindale*,
439 F.3d 695, 699 (6th Cir. 2006) (citing *Sheets v. Mullins*, 287 F.3d 581, 586 (6th cir.
2002)).  Plantiffs here have not made this showing.

Whether qualified immunity applies turns on the "objective legal reasonableness"
of the official's action, viewed on a fact-specific, case-by-case basis. *Id.* (citing *O'Brien
v. City of Grand Rapids*, 23 F.3d 990, 999 (6th Cir. 1994)).  To analyze claims of
qualified immunity, the court uses a two-part test "(1) whether, considering the
allegations in a light most favorable to the party injured, a constitutional right has been
violated, and (2) whether that right was clearly established." *Estate of Carter v. City of*

22

*Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005) (citing *Saucier v. Katz*, 533 U.S. 194, 201

(2001)). "The contours of the right must be sufficiently clear that a reasonable official

would understand that what he is doing violates that right." *Anderson v. Creighton*, 483

U.S. 635, 640, 107 S.Ct. 3034 (1987).  If the controlling law is not clearly established, an

official cannot be liable, because "a reasonable person would not be expected to know

how to structure his conduct to avoid liability." *Mendoza v. Block*, 27 F.3d 1357, 1361

(9th Cir. 1994).  To demonstrate a clearly established constitutional violation requires

on-point, controlling authority or a "robust consensus of cases of persuasive authority."

*Ortega v. U.S. Immigration and Customs Enforcement,* 737 F.3d 435, 439 (6th Cir.

2013) (quoting *Ashcroft v. al-Kidd*, ___ U.S. ___, 131 S.Ct. 2074, 2084, 179 L.Ed.2d

1149 (2011)).

 Further, "[t]he relevant, dispositive inquiry in determining whether a right is

clearly established is whether it would be clear to a reasonable officer that his conduct

was unlawful **in the situation he confronted**." *Saucier, supra*, 533 U.S. at 202

(emphasis added).  *See also, Armstrong v. City of Melvindale, supra*, ("In undertaking

this inquiry, we do not assess the right violated at a high level of generality, but instead,

we must determine whether the right [is] 'clearly established' in a more particularized

sense. . . ."); *Perez v. Oakland County*, 466 F.3d 416, 428 (6th Cir. 2006) ("Because

most legal rights are clearly established at some level of generality, immunity would be

impossible to obtain if a plaintiff were required only to cite an abstract legal principle

23

that an official had 'clearly violated.'")

Assuming *arguendo* that the loss in value of Plaintiffs' business following Defendants' initiation and continuation of their investigation into Plaintiffs' practice constituted a Fourth Amendment seizure, Plaintiff's rights under the Fourth Amendment in this context cannot be said to have been clearly established at the time of the investigation, nor since.  Plaintiffs do not maintain, nor is there evidence suggesting that Defendants ordered the cessation or closure of Plaintiffs' business.  Innovative Medicine remains listed as an "active" for-profit professional corporation according to the State of Michigan's corporate records.  *See* WESTLAW, CORP-MI database.  If Plaintiffs have closed their business, they made that decision themselves.  Further, as indicated above, Plaintiffs have not pointed to a single case from any court holding that a loss of business revenue or customers following the initiation of a government investigation of the defendant or the defendant's business in and of itself constitutes a seizure.

Nor do Plaintiffs claim a "constructive seizure" and, in any event, no facts in this case make out such a claim.  "Constructive seizure requires the officer to reduce the property to his dominion and control."  *CTC Investment Co., Inc. v. Daniel Boone Coal Corp.* 58 F. 2d 305 (Ed Ky. 1931).  *See also In re Tennessee Forging Steel Corp.*, 1978 WL 4555 (E.D. Tenn. 1978) (To constitute a constructive seizure, "[t]he officer must perform some act which not only indicates an intention to seize the property, but he must reduce it to possession, or, at least, bring it within his immediate control." *Id.*)  There is

24

no evidence here of any attempt of Defendant Lincoln or Williams to exercise dominion or control over Innovative Medicine.

For all of the foregoing reasons, the Court finds that Defendants Williams and Lincoln did not violate any clearly established Fourth Amendment right of which a reasonable officer would have known by initiating and conducting an investigation of Plaintiffs' practices on behalf of the State of Michigan Department of Licensing and Regulatory Affairs.  Therefore, the Court will GRANT Defendants' Motion for Judgment on the Pleadings on Count IX of Plaintiffs' Amended Complaint.

C.    THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION
      OVER PLAINTIFFS' REMAINING CLAIMS

All of the other claims in Plaintiffs' First Amended Complaint are state law claims over which the Court has no original jurisdiction.  A district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  District courts have "broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1254 (6th Cir.1996). Generally, "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims, or remanding them to state court if the action was removed." *Id*. at 1254-55. In fact, the Sixth Circuit has held that "a federal court that has dismissed a plaintiff's federal-law claims should ***not*** ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465

25

F.3d 719, 728 (6th Cir.2006) (citation omitted; emphasis added); *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 900 (6th Cir.2001) ("[T]he usual course is for the district court to dismiss the state-law claims without prejudice if all federal claims are disposed of on summary judgment."). *See also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well."). This rule accords with principles of federalism: "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *Gibbs*, 383 U.S. at 726, 86 S.Ct. 1130.

Guided by the foregoing principles, the Court concludes that it should decline to exercise jurisdiction over Plaintiffs' claims in Counts I through VIII of Plaintiffs' First Amended Complaint alleging gross negligence, fraudulent and negligent misrepresentation, intentional infliction of emotional distress, tortious interference with business relationship and business expectancy. Therefore, these state-law claims will be dismissed, without prejudice.

<u>CONCLUSION</u>

For all of the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that Plaintiff Rhonda Sousley's Motion for a Preliminary Injunction **[Dkt. #2]** is DENIED.

26

IT IS FURTHER ORDERED that Defendants' Motion for Judgment on the Pleadings **[Dkt. # 49]** is GRANTED, IN PART.

IT IS FURTHER ORDERED that Plaintiffs' Section 1983 claim for violation of Plaintiffs' Fourth Amendment rights (Count IX of Plaintiffs' First Amended Complaint) is DISMISSED, WITH PREJUDICE.

The Court having declined to exercise supplemental jurisdiction over Plaintiffs' state-law claims,

IT IS FURTHER ORDERED that Plaintiffs' state law claims in Counts I through VIII of Plaintiffs' First Amended Complaint alleging gross negligence, fraudulent and negligent misrepresentation, intentional infliction of emotional distress, tortious interference with business relationship and business expectancy are DISMISSED, WITHOUT PREJUDICE.

IT IS FURTHER ORDERED that Defendants' Motion to Stay Discovery **[Dkt. # 48]** is denied as MOOT.

Let Judgment be entered accordingly.

s/Gerald E. Rosen
Chief Judge, United States District Court

Dated:  August 15, 2014

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 15, 2014, by electronic and/or ordinary mail.

s/Julie Owens
Case Manager, (313) 234-5135

27